UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-20295-CR-SEITZ

**UNITED STATES OF AMERICA,**

    Plaintiff,

vs.

**RAUL S. RAMIREZ,**

    Defendant.
_____/

### ORDER DENYING, WITHOUT PREJUDICE, SECOND AMENDED MOTION FOR REDUCTION AND/OR MODIFICATION OF BOND

Presently pending before this Court is the Third Amended Motion for Reduction and/or Modification of Bond filed by Defendant Raul Ramirez (DE # 116), as well as the Defendant's Motion to Modify Nebbia Requirement and to Fulfill Nebbia Requirement to be Set by the Court (DE #119); various supplemental exhibits and memoranda (DE # 118, 123, 125, 134), and related motions for a hearing (DE # 117, 120, 135 and 164). The Government has responded in opposition (DE # 128).

In this motion, Defendant Ramirez seeks to reduce the presently set bond from a $150,000.00 corporate surety bond and a $200,000.00 personal surety bond, to be co-signed by his wife and daughter and persons who establish that they have assets worth $200,000.00, to a $150,000.00 corporate surety bond and a $100,000.00 personal surety bond, to be co-signed by his wife and daughter, without the requirement that it be co-signed by persons who establish they have assets worth $100,000.00,[1] or in the

---

[1] Although this is the request as stated on page 9 of the Motion, it also appears that the Defendant is arguing that the co-signers have $100,000 in equity in property (DE # 116 at 8)..

alternative, to permit certain property which is the subject of litigation in state court, which is worth approximately one million dollars ($1,000,000.00) to be used as collateral. The Defendant also states that he has been able to obtain $22,500.00 to pay the premium for the corporate surety bond, and that representatives of Best Bailbonds are willing to issue this bond.

For the reasons stated below, as well as the reasons given at the prior bond hearing which reduced the initial bond to the amount presently set, and the reasons set forth in the prior detailed Order of the undersigned Magistrate Judge (DE # 89), the motion is denied, without prejudice. Specifically, the Court is not satisfied that the property being used to secure the corporate surety bond is worth the amount of that bond; and, the undersigned does not believe that an unsecured personal surety bond co-signed by persons without sufficient assets, is sufficient to secure the Defendant's presence. Although the undersigned has left open the possibility of a reduced bond, depending on the nature of the collateral used to secure the bond, and the persons willing to serve as co-signers, the undersigned does not find that such a reduction is warranted based upon the presently proposed security.

I.   BACKGROUND

Defendant Raul Ramirez is charged in a 16-count Indictment with conspiracy to commit health care fraud, health care fraud and money laundering. If convicted on these charges, the Government has estimated that the advisory Sentencing Guideline range is between 262 and 327 months (July 7, 2009 hearing).[2]  In addition, the Government

---

[2] The Government has also estimated the advisory Guideline Range to be between 135 and 188 months, which was a computation made without reference to various specific offense characteristics that might apply  (DE # 26 at 4).

indicated that it may seek an upward adjustment in the Defendant's criminal history category, which would result in an advisory Sentencing Guideline range of between 292 and 362 months. Based upon the facts proffered at the various hearings, as well as a review of the record as a whole, it appears that the Government's case is very strong.

According to the proffer of the Government, which is summarized in its Response in opposition to the prior Motion for Reduction of Bond (DE # 26), from approximately February 2004 through April 2005, Defendant Ramirez caused his medical clinic, R.A. Medical Center to bill Medicare for over $24 million for purported HIV related treatments. As a result of these billings, Medicare paid approximately $7,000,000.00. The scheme involved the payment of kickbacks to patients in order to bill for treatments that were not medically necessary and not provided. In addition, blood samples were altered to justify the billings. The evidence upon which the Government relies, although challenged by the Defendant, appears strong to the undersigned Magistrate Judge. In a prior civil forfeiture proceeding, the Defendant agreed to the forfeiture of $5,000,000.00 which he had received as a result of the above billings. The Government does not have evidence that the Defendant maintained a "cash hoard" with respect to the remainder of the funds billed, although at the detention hearing the Government proffered that it had not been able to trace approximately $1.4 million in cash.

The physician who ordered the treatments which were the subject of the billings, Dr. Barata, resided in New York, and made periodic trips to Miami, Florida. Dr. Barata has since died, and there is litigation pending in the Eleventh Judicial Circuit, in and for Miami-Dade County, Florida, which was brought by his estate to recover certain property which it alleges Defendant Ramirez fraudulently obtained from Dr. Barata. The value of the property involved in that case is substantial and apparently involves more than two

million dollars.[3]

## II. THE DEFENDANT'S BACKGROUND

The Defendant has a criminal record which involves prior convictions for a weapons violation in the District of Columbia in 1986; assault in the District of Columbia in 1983; and possession of cocaine in Miami-Dade County in 1986, for which adjudication of guilt was withheld.  In addition, the record provided by the Government in its opposition to the prior motion reflects that he pled guilty to a misdemeanor bond violation in the District of Columbia (DE # 86).  The undersigned recognizes that the Defendant was acquitted in 2006 of the unauthorized practice of medicine at the clinic which forms the basis for the charges in the case at bar.

The Defendant is 54 years old, and was born in Cuba.  He entered the United States in 1980, and is a permanent resident.  There is an outstanding warrant of removal based upon his drug conviction; however, counsel proffered that the State Court Judge before whom the Defendant pled guilty has indicated that he would vacate the conviction if it caused the Defendant to be subject to deportation as a result of that conviction.  He

---

[3] The Defendant has alleged that there is approximately one million dollars at stake in this lawsuit (DE # 81 at 8; DE # ).  According to the proffer of the attorney handling the civil litigation on behalf of Defendant Ramirez, there are two condominiums and an office building which are the subject of the state court litigation.  The heirs allege that Defendant Ramirez forged Dr. Barata's name on certain documents which transferred these properties to Defendant Ramirez.  It appears that the litigation involves properties which are listed in the Pretrial Services Officer's report as a residence (later corrected to be an office) worth $1,500,000; a residence (later clarified to be a Miami Beach condominium) worth $400,000.00; and a residence worth $700,000.00.  It appears from the exhibits filed in support of the present motion, that the value of those properties has declined significantly (DE # 123-1 at 4-6).

   Defendant Ramirez is also involved in a dispute involving a car accident in which he was injured and is seeking to recover damages, although the present status of that matter is not known.  According to the Defendant's motion, he hopes to net approximately $50,000.00 as a result of this litigation (DE # 81 at 8).

has resided in Miami-Dade County, with his spouse, since 1986. He has two children, who are ages 22 and 14. At the time of his arrest, the Defendant worked as a coach and manager at the AAA Baseball Academy, which he had owned and operated for seven years. The Defendant's mother and three half-siblings reside in Cuba. The Defendant reported to pretrial services that he had not traveled outside the United States during the past five years.

## III.     THE PREVIOUS PROCEEDINGS REGARDING THE DEFENDANT'S BOND

The undersigned Magistrate Judge has previously held a lengthy detention hearing (DE # 7, April 9, 2009), as well as two additional lengthy hearings on motions to modify the bond (DE # 39, July 7, 2009; DE # 45, August 20, 2009). During these hearings, this Court carefully considered the individual circumstances of this Defendant and the charges pending against him in determining the bond required to reasonably assure his presence in court. None of these hearings have been transcribed. The numerous filings regarding bond have also been considered (DE ## 16, 17, 26, 36, 41, 42, 56, 63, 69, 81, 82, 86, 116-120, 123, 125, 128, 134, 135, 139, and 164). The undersigned has also reviewed the record regarding other proceedings held in this case.

As previously stated in the earlier Order denying the Defendant's Second Amended Motion for Reduction and/or Modification of Bond (DE # 89), at the Defendant's initial appearance in Court on these charges, the Government requested that the Defendant be held in pretrial detention based upon his risk of flight. Following the detention hearing, and based upon the pretrial services report, and the proffer of defense counsel, the undersigned Magistrate Judge denied the Government's request for detention because, although there was a serious risk of flight, the undersigned determined that, based upon what appeared to be extensive ties to this community, and

5

the ability of the Defendant to post a high corporate surety bond, there were conditions which could be set to reasonably assure his appearance at trial. Thus, the Court set a $300,000.00 corporate surety bond, with a Nebbia condition, and a $100,000.00 personal surety bond, co-signed by the Defendant's wife and daughter, together with certain non-financial conditions.

Thereafter, the Defendant sought a reduction in the amount of his bond (DE # 41). After a hearing, and considering the circumstances, the Court modified the financial conditions of the bond to a $150,000.00 corporate surety bond, with a Nebbia condition, and a $200,000.00 personal surety bond to be co-signed by the Defendant's wife and daughter, and other persons who, collectively, own property worth $200,000.00 (and who provide affidavits which establish the sufficient value of such assets, pursuant to 18 U.S.C. § 3142(c)(1)(B)(xii)).  In addition, the Court set the following non-financial conditions of release: (1) Execute all appropriate documentation to ensure that any property or funds which are presently the subject of litigation in state court against the heirs of Dr. Barata will be held in escrow by the Defendant's attorney, and not released to him absent further Order of the Court, or until the bond is discharged; (2) Surrender all travel documents; (3) Report to the pretrial services division of the U. S. Probation Office as directed by them; (4) Submit to random drug testing, based upon his history of drug use; (5) None of the signatories to the bond are permitted to encumber any property they own without prior permission of the Court; (6) No contact with the witnesses to, or the victims of, the charges crimes, except through counsel; (7) No possession of firearms; (8) Home confinement with electronic monitoring, to be paid for by the Defendant based upon his ability to pay; except for medical visits, attorney visits, and court-ordered obligations, with prior notice to and approval by the pretrial services

officer.

Thereafter, a Second Amended Motion for reduction and/or Modification of Bond was filed (DE # 81).  In connection with that Motion, this Court carefully reviewed the evidence proffered by the Government and the motions filed by the Defendant, as well as the arguments, evidence and proffers made at three lengthy hearings, and determined that the amount and type of bond previously set by this Court was necessary to reasonably assure the appearance of the Defendant as required (DE # 89).  In reaching this result, the undersigned noted that the Defendant had failed to set forth the properties and personal guarantees of the individuals who are willing to assist with the bond, but left open the possibility of some further reduction depending upon the availability of other persons to satisfy the personal surety obligations of the bond.  The undersigned also noted that the documentation regarding the state court lawsuits had not been provided.

The undersigned also determined that in view of that decision, it was not necessary to have an additional hearing, but that if the Defendant was able to proffer sufficient facts to establish that he would be able to satisfy the requested modification of the bond, a hearing might be appropriate at that time.  In making this determination, the undersigned specifically advised the Defendant that a mere statement that the bondsman is satisfied is not sufficient to establish the value of the properties proposed to be used as collateral.

### IV.     THE PRESENTLY PENDING MOTIONS

In his Third Amended Motion, the Defendant no longer seeks to reduce the amount of the corporate surety bond, but seeks to reduce the amount of the personal surety bond to $100,000.00, to be co-signed by his wife and adult daughter, and seeks to

excuse the requirement that persons with sufficient assets to cover the amount of the personal surety bond be co-signers on that bond.  The Defendant bases his request on his challenge to the strength of the Government's case, the fact that he is unable to post the bond that is presently set, and the fact that he is suffering from injuries to his neck and lower back, which he received in an automobile accident in March 2006.  He has submitted various medical records which document his injuries.  In addition, to challenge the strength of the Government's case and the Government's assertion that there was approximately $2 million that was still owed to the Government after the forfeiture settlement, he has filed an excerpt from the deposition of his expert witness, which was taken in the related prior civil forfeiture proceedings (DE # 125).

In opposition, the Government opposes any reduction in the bond, reiterates its initial position that the Defendant should be pre-trial detained, and also challenges the property which the Defendant seeks to post to secure his release (DE # 128).

The Defendant has submitted a Nebbia Proffer, through which he seeks to establish that he has satisfied the requirements of the corporate surety bond, and that the personal surety bond should be reduced.  The following discussion sets forth the positions of the parties, as well as the Court's analysis regarding the Defendant's proposal.

1. The premium for the $150,000.00 corporate surety bond is $22,500.00, which will be paid by his wife, Odalys Ramirez ($20,000.00) and his daughter, Nathalie Ramirez ($2,500.00).  Odalys Ramirez obtained $7,000.00 from a Visa credit card, $9,800.00 from a Mastercard, and $200.00 from a second Visa Card.  She obtained the remaining $3,000.00 from her checking account (DE # 118-2 at 6).  Nathalie Ramirez derived the money she is contributing from two checks she received from FIU Student Refunds (DE # 118-2 at 28).

The Government challenges the use of credit cards to secure the money used to pay the premium for the bond, stating that those charges may not be repaid if the Defendant flees (DE # 128 at 1 n.1).  In addition, the Government challenges the apparent use of student loan money by the Defendant's daughter (*Id.*).  The Government also challenges the reliability of the Defendant's wife and daughter as co-signers on the personal surety bond since another Magistrate Judge found that they were not credible witnesses when they testified on behalf of the Defendant at a hearing on the Defendant's motion to suppress (DE # 128 at 2).

In a 2nd Supplemental Filing of Exhibits, the Defendant filed documents to show that the money contributed by Nathalie Ramirez was derived from a loan, and not funds provided for her schooling (DE # 134).  However, a review of those documents shows that the loans were made in connection with her schooling.  There is no indication, however, that she is prohibited from using those funds as she deems fit during the course of her education.

The undersigned agrees with the Government that use of funds obtained through a credit card are not a sufficient guarantee of appearance; and therefore the undersigned would be hesitant to accept credit card withdrawals to satisfy a financial condition of the bond, e.g., a requirement that a percentage be deposited in the registry of the Court.  Here, however, those funds are being used to satisfy the premium owed for the corporate surety bond, and those same concerns do not apply.  Therefore, the undersigned finds that the funds used to pay the premium may properly be used for that purpose.

2. The corporate surety has secured a Mortgage Deed on the property purchased by the Defendant and his wife in November 1996, and has determined that the estimated

market value of this property is $225,000.00.  Odalys Ramirez filed an Affidavit stating that the address of this property was 5501 N.W. 182nd St., Miami, FL, and that the estimated market value was $225,000.00, and that there was a mortgage balance owed of $149,000.00 (DE # 118-2 at 51).  The Miami-Dade County Property Appraiser estimated the market value of this property in 2009 to be $254,288.00 (DE # 118-2 at 59).

In opposition, the Government notes that this property is the subject of the forfeiture allegation in the Indictment (DE # 128-1 at 2).  An estimate of the market value according to an appraisal ordered by the U.S. Marshal's Service in April/May 2009 reflected a value of $122,000.00.   According to the Government, in March 2010, Chase.com estimated the market value to be $143,000; and, Zillow.com estimated the market value to be $172,000.00.

In Reply, the Defendant challenges the use of the U.S. Marshal's Service appraisal since that appraisal is so much lower than the others.  He also challenges the amount of forfeiture attributable to this residence, stating that the AUSA has indicated that only minimal amounts of money alleged to be proceeds of the fraud were directly traceable to this residence.

At the outset, the undersigned notes that the Government has included this residence as subject to forfeiture in the Indictment and in the Bill of Particulars as to forfeiture (DE # 29).  In addition, the Government seeks a forfeiture judgment in the amount of $1,933,124.71, and has stated it intends to use substitute assets to satisfy this amount, assuming it obtains the requested judgment.  Due to the status of this property, the undersigned declines to permit this property to be used as collateral for the bond.

However, even if it were permitted to be used, the undersigned finds that the value of this property, even omitting the low appraisal of the U.S. Marshal's Service, is

between $143,000.00 and $225,000.[4] Taking the average of these amounts, the fair market value is $184,000.00.[5] The outstanding mortgage is approximately $149,000.00, yielding equity of approximately $35,000.00.

     3. The corporate surety has secured a Mortgage Deed on property belonging to the Defendant's friend, Ursula M. Torres, which is a single family home purchased in January 1992, and which has an estimated market value of $190,000.00. Ursula Torres is pledging her property located at 3545 N.W. 98th St., Miami, Florida (DE # 118-2, at 39-50). She states in her Affidavit that the property has an estimated market value of $190,000.00, and has a mortgage balance of $134,350.00 (DE # 118-2 at 39). The Miami-Dade County Property Appraiser estimated the market value in 2009 to be $134,953.00 (DE # 118-2 at 48).

     The Government challenges the use of this property, since Ursula Torres is a friend of the Defendant's wife, and her potential loss of this property may not be a compelling reason for Defendant to not flee (DE # 128-1 at 2). In addition, the Government asserts that the value range is between $138,000 to $172,000, and that there are two unsatisfied mortgages–one for $135,000.00 and a second for $50,000.00, leaving an equity in this property between negative $47,000.00 to negative $13,000.00. Even if

---

    [4] The undersigned has excluded the Miami-Dade County Property Appraiser's estimate of $255,000.00, which is a dated estimate since it is based on value as of January 2009; and which is above what the Defendant contends is the fair market value.

    [5] If the this property was permitted to be used, and if the amount of equity in the proposed properties was even close to satisfying the collateral requirements, the undersigned would hold an evidentiary hearing to better establish the fair market value since the $225,000 estimate by the Defendant's wife is questionable in light of the variance from both Chase.com and Zillow.com, as well as the U.S. Marshal's appraisal. Even if $225,000 was used as the estimated fair market value, the net equity would only be $76,000.00.

the Defendant's estimated fair market value of $190,000.00 was used, however, the net equity would only be $5,000.00.

As noted in the previous Order entered by the Court (DE # 89), it is unclear how the Defendant arrived at an estimated market value of $190,000.00.  At the Nebbia hearing held in August 2009, the defense estimated the equity to be between $150,00.00 and $175,000.00.  Also, at that same hearing, the Government stated that according to Chase.com, the value was $162,000.00.  According to the Government, the Chase.com value as of March 2010, had dropped to $138,000; an estimate from Zillow.com in March 2010 was $172,000.00.

The Defendant did not address the Government's contentions in his Reply, including the contention that the total amount of the mortgages on this property is $185,000.00.

Using the average of the lowest estimate of fair market value ($138,000.00),[6] and the highest estimate ($190,000.00), the property has a fair market value of $164,000.00. Thus, there is no equity in this property.

4.  The corporate surety has secured the following vehicles owned by the Ramirez family:

2006 Chevrolet Cobalt, valued between $7,250.00 - $8,475.00

1992 Mercedes Benz 300se, valued between $5,525.00 - $6,625.00

1993 Mercedes Benz 500, Valued between $9,925.00 - $11,525.00

An Affidavit filed by Odalys Ramirez states these amounts, which are confirmed by

---

[6] As with the other property, the undersigned has excluded the Miami-Dade County Property Appraiser's estimate, which is a dated estimate since it is based on value as of January 2009.

printouts from Kelley Blue Book's private party values (DE # 118-2 at 51-57). These values have not been challenged, and the undersigned finds that the total value of the vehicles is between $22,700.00 and $26,625.00. An average of these amounts yields an estimated total value of approximately $24,662.00.

In addition, the Defendant filed supplemental exhibits which document the properties which he received from Joseph Barata through quit claim deeds, and which are the subject of the pending state litigation against the heirs of Dr. Barata (DE # 123). The Government asserts that these properties are either named in the forfeiture allegation of the Indictment, or are subject to seizure as substitute assets (DE # 128-1 at 2-3). The parties dispute the value of these properties.

It is not necessary to delve into that dispute, however. The properties are the subject of the pending litigation, and the undersigned took into account those properties in fashioning the existing bond. Specifically, the Court has prohibited any further encumbrance of those properties, and has required the Defendant to "execute all appropriate documentation to ensure that any property or funds which are presently the subject of litigation in state court against the heirs of Dr. Barata will be held in escrow by the defendant's attorney, and not released to him absent further Order of the Court, or until the bond is discharged" (DE # 89 at 2-3). Based upon the circumstances surrounding those properties, they may not be used to satisfy the existing conditions of bond.

In sum, based upon the proffered evidence, even if the Defendant's residence was permitted to be used as collateral, the undersigned finds that the value of the properties to be used as collateral is $59,662.00, far short of the $150,000.00 required to collateralize the corporate surety bond. Even using the estimates given by the

**Defendant, the amount of collateral is only $105,662.00. Absent the Defendant's residence, the only collateral with any equity consists of three used vehicles worth under $25,000.00.**

**In addition, the undersigned reaffirms the original requirement for persons with $200,000.00 in property co-sign the bond. In this regard, the undersigned notes that Marisa Garcia, a person previously willing to post property who testified at the Nebbia hearing, is now apparently unwilling to do so. One of the primary reasons which led the undersigned to deny the Government's request for pretrial detention was the belief that there were many members of the community willing to stand behind Mr. Ramirez. Thus, if those persons were willing to co-sign a personal surety bond and risk the loss of substantial assets, the undersigned was satisfied that Mr. Ramirez could be released. This community support is not there, however, and the undersigned does not believe that the elimination of this requirement is warranted.**

**It is well settled in this Circuit that the court can insist on a financial condition of release, even if the defendant is unable to meet this condition, if the court finds that it is reasonably necessary to insure the defendant's presence. *United States v. Wong-Alvarez*, 779 F.2d 583 (11th Cir. 1985); *appeal after remand, United States v. Wong-Alvarez*, 784 F.2d 1530 (11th Cir. 1986). Other circuits have reached the same conclusion. *United States v. Mantecon-Zayas*, 949 F.2d 548 (1st Cir. 1991); *United States v. McConnell*, 842 F.2d 105 (5th Cir. 1988); *United States v. LeClercq*, 2007 WL 4365601 at \*2 (S.D. FL. 12/13/2007) (citing additional cases). After conducting a full review of the record in this case, this Court remains convinced that the least restrictive means necessary for this purpose have been imposed on the Defendant. The evidence against the Defendant is substantial and the Defendant is facing a significant period of incarceration if convicted**

on the charges in the case at bar. The estimated guideline range, if all enhancements sought by the Government are imposed, may be tantamount to a life sentence for this Defendant. He is not a citizen of the United States, and there is an outstanding order of removal based upon a prior conviction. Even if that conviction is vacated, he will be subject to removal if convicted on these charges. He has significant ties to Cuba since his mother and three half-siblings reside there. He was self-employed at the time of his arrest in a business which, according to his report to pretrial services, has no value except for his services as a coach and manager. Therefore, the undersigned concludes that the only conditions of release that will reasonably assure the presence of the Defendant involve a significant corporate surety bond, combined with a significant personal surety bond co-signed by family members and/or members of the community with sufficient assets.

Based upon a review of the record as a whole, and the above findings and conclusions, the undersigned has determined that no hearing is necessary.

Therefore, based on a careful review of the record, it is hereby

**ORDERED AND ADJUDGED** that the Third Amended Motion for Reduction and/or Modification of Bond (DE # 116), as well as the Defendant's Motion to Modify Nebbia Requirement and to Fulfill Nebbia Requirement to be Set by the Court (DE #119);and related motions for a hearing (DE # 117, 120, 135 and 164) are **DENIED**.

**DONE AND ORDERED** in chambers in Miami, Florida on May 12, 2010.

*Andrea M. Simonton*
_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished via CM/ECF  to:
 The Honorable Patricia A. Seitz, United States District Judge
 All counsel of record